# Wright's Estate.

*Will—Issue devisavit vel non—Evidence—Testamentary capacity.*

On an application for an issue devisavit vel non, a conveyancer who had known the testator for many years, testified that in January, 1895, the testator called, unattended by any one, at his office, and requested him to draw his will. His directions were clear, and embraced gifts of various pieces of real estate, each of which he described, to his three sisters, and a gift of the residue of his estate to one of the sisters. The will was drawn, and, after a slight change, which he himself suggested, was read over by the testator and approved by him, and it was then signed by him in the presence of the conveyancer and his son, both of whom testified, to the testator's entire testamentary capacity. The will was deposited by the testator in his box at a trust company, and remained there until his death five years afterwards. A large number of witnesses on the part of the proponent declared that before and after 1895, the testator was of sound mind; received and receipted for rents, drew checks and made deposits; visited his friends and conversed intelligently. The various checks which were offered in evidence and the will itself, in each of which the signature of the decedent was bold and clear, bore out these assertions. The sister who received the residue of the estate managed the decedent's household affairs until his death. The contestants offered testimony to the effect that testator was untidy in his dress, that he was filthy in his use of tobacco, that he drank on an average a quart of whiskey daily, carried bottles of liquor in his pockets, and even took them at night into his bed, that he was eccentric in this that he shook hands with people whom he did not know, wept copiously, especially when he witnessed a play at the theatre and talked more or less ramblingly. The dates assigned for these various occurrences were vague and conjectural. *Held*, that an issue was properly refused.

Argued Jan. 20, 1902. Appeal, No. 95, Jan. T., 1901, by Caleb Wright and Elizabeth Crombie, from decree of O. C. Phila. Co., July T., 1900, No. 76, dismissing appeal from register of wills in estate of Philip Wright. Before McCOLLUM, C. J., MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Appeal from register of wills.

ASHMAN, J., filed the following opinion:

A conveyancer, who had known the testator for many years, testified that in January, 1895, the testator called, unattended

by anyone, at his office, and requested him to draw his will. His directions were clear, and embraced gifts of various pieces of real estate, each of which he described, to his three sisters, and a gift of the residue of his estate to one of the sisters. The will was drawn, and, after a slight change, which he himself suggested, was read over by the testator and approved by him, and it was then signed by him in the presence of the conveyancer and his son, both of whom testified, in emphatic terms, to the testator's entire testamentary capacity. The will was deposited by the testator in his box at the trust company, and remained there until his death, five years afterwards. A large number of witnesses on the part of the proponent declared that before and after 1895, the testator was of sound mind; received and receipted for rents, drew checks and made deposits; visited his friends and conversed intelligently. The various checks which were offered in evidence and the will itself, in each of which the signature of the decedent was bold and clear, bore out these assertions. In 1898, he was attacked with a paralytic stroke, and thereafter his speech was impaired, and he had even to be assisted at the table. Against this positive evidence of his mental state when he executed the will, the contestants and their witnesses declared that the testator's mental degeneracy began before 1895, and was even then so advanced as to unfit him for the transaction of any business whatever. It goes without saying, that the opinions of the witnesses on this point are valuable or worthless only as they were backed by competent facts. This remark applies as fully to the testimony of the very eminent alienists as to the other witnesses called by the contestants. The experts had never seen the testator and had not heard the testimony, but they were asked a hypothetical question, two typewritten pages in length and based wholly upon the statements of witnesses for the contestants—a method which was as unscientific as it was unjust. The points against the testator were that he was untidy in his dress, that he was filthy in his use of tobacco, that he drank on an average a quart of whiskey daily, carried bottles of liquor in his pockets, and even took them at night into his bed. He was eccentric in this, that he shook hands with people whom he did not know, wept copiously, especially when he witnessed a play at the theatre, and talked more or less ramblingly. Many of these statements

were on their face grossly extravagant, but, conceding their absolute verity, the dates assigned for the various occurrences were vague and conjectural. If they related to a period later than January, 1895, they are out of this case altogether. The testator's bank checks, drawn as late as 1897, and the provisions of his will are authoritative proofs of his sanity which cannot be overcome by a thousand vague recollections of witnesses to his eccentric behavior. His mental aberration began, according to one witness, about 1885, yet, from that year up to 1893, the decedent drew a salary as foreman in a factory which amounted to more than $1,200 per annum. Against the testimony of the witnesses who never saw the decedent and pronounced against his testamentary capacity upon a naked hypothetical question, there was the testimony of an equally reputable physician who attended the decedent professionally in 1894 or 1895, and swore that she considered him a man of remarkable intelligence. All of his sisters were beneficiaries under his will, and the residuary gift, which occasioned this contest, will not exceed $7,000. This, with the previous devise to the donee, would scarcely have afforded her the means of comfortable subsistence. This sister, with whom the decedent lived, managed his household affairs until his death, a fact which, in itself, would explain the preference accorded her in the disposition of the estate. She died April 10, 1900, three months after the present decedent, and her will was attacked by the same parties who figure in this contest and upon the same grounds. That appeal was withdrawn for the alleged reason that a material witness was mentally incompetent to testify. It is probable that neither will, if it had stood alone, would have been the subject of litigation. The conjuncture of the two wills and the two deaths, by putting Mrs. Moore, a sister, into possession of a considerable share of the joint estate, seems to have aroused against her, on the part of Caleb Wright, the brother, who took nothing, an unreasonable jealousy. Between this brother and the testator a confessed hostility, originating in a dispute over the value of the father's estate, already existed, aggravated no doubt by a letter which was written in December, 1894, by a son of Caleb Wright, and shown to the decedent, in which the writer characterized his uncle, the testator, and his aunt, the residuary legatee, as "the most diabolical

hypocrites that the world has known," etc., and in which he made his aunt the subject of a vile innuendo. Shortly afterwards a photograph of himself was sent to the decedent, across the face of which was written "Judas Iscariot," and "Mawkish Hypocrite," and a copy of this photograph and of these inscriptions was also sent to Janet Wright. Whether these pictures were needed to complete the insult which had been already conveyed by the letter, is a matter of opinion ; but, without a single fact in the evidence to warrant suspicion, and against all the probabilities of the case, their preparation and sending were ascribed by the contestant's counsel to Mrs. Moore. The case does not need and does not merit further discussion. It has, on the one side, the usual concomitants of a contest of this character—chagrin over a supposed neglect and envy of a supposed rival; although the rival received under this will, and we have no other before us, a benefit too trivial to be the subject of an appeal. On the other side, the fact that the provisions of the will originated with the testator himself, and showed in its selection of the objects of bounty a just and wise discrimination, and the fact that before and after its execution the testator transacted business in a business-like manner, were so clearly shown, that no jury could properly find against his testamentary capacity. The appeal is dismissed.

*Error assigned* was the decree of the court.

*E. Spencer Miller*, for appellant.

*J. Campbell Lancaster* and *Charles E. Lex*, for appellee, were not heard.

PER CURIAM, May 5, 1902 :
The judgment is affirmed on the opinion of Judge ASHMAN.